The **BOARD OF EDUCATION OF the CITY OF ST. LOUIS, Respondent,**

v.

**LABOR AND INDUSTRIAL RELATIONS COMMISSION, DIVISION OF EMPLOYMENT SECURITY and Lorraine Kimbrow, Appellants.**

No. 32643.

Missouri Court of Appeals,
Western District.

March 2, 1982.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied May 4, 1982.

Application to Transfer Denied
June 14, 1982.

Timothy P. Duggan, Jefferson City, for appellants.

Richard L. Waters, Bruce D. Johnston, St. Louis, for respondent.

Before NUGENT, P. J., and TURNAGE and LOWENSTEIN, JJ.

LOWENSTEIN, Judge.

This is an appeal from the circuit court's reversal of the decision of the Labor and Industrial Relations Commission (Commission) to grant claimant-appellant Lorraine Kimbrow (claimant) unemployment benefits under the Missouri Employment Security Law, Chapter 288, RSMo 1978.[1]

The circuit court judgment is affirmed.

The facts here are undisputed, thus the primary question in this case is one of law, to-wit: is a non-permanently certified substitute teacher who accepts employment pursuant to a temporary teaching certificate of a fixed term eligible for unemployment benefits under Chapter 288 when that term expires?

The sections of Chapter 288 that are applicable here include § 288.050, which read in pertinent part:

Benefits denied unemployed workers, when—1. Notwithstanding the other provisions of this law a claimant shall be *disqualified* for waiting week credit or benefits until after he has earned wages equal to ten times his weekly benefit amount if the deputy finds

(1) That he has *left his work voluntarily without good cause attributable to his work or to his employer;*

\*  \*  \*  \*  \*  \*

2. Notwithstanding other provisions of this law, if a deputy finds that a claimant has been suspended or *discharged for misconduct connected with his work*, such claimant, depending upon

the seriousness of the misconduct as determined by the deputy according to the circumstances in each case, shall be disqualified for waiting week credit or benefits for not less than one nor more than sixteen weeks for which he claims benefits and is otherwise eligible. (Emphasis added.)

\*  \*  \*  \*  \*  \*

In addition to these disqualification sections, § 288.020.1 declares that the general purpose of the Missouri Employment Security Law is to provide for the "compulsory setting aside of unemployment reserves to be used *for the benefit of persons unemployed through no fault of their own."* (Emphasis added).

The claimant, Lorraine Kimbrow, was employed by the respondent, St. Louis Board of Education (Board) as a substitute school teacher in the 1978–1979 school year. During that year, claimant did not have a permanent teaching certificate, but had only a temporary certificate from the State Board of Education which allowed her to teach 45 days during the school year.[2] At the request of the St. Louis Board, the State Board granted claimant a 45 day extension of her temporary certificate. At the end of these 90 days (March 30, 1979), claimant was prohibited from teaching in a public school by § 168.011, and the Board was prohibited from offering her further employment in that school year by § 168.-081, even though the Board still was in need of her services, and she still desired to teach.

On October 31, 1979, claimant applied for employment benefits with appellant, Division of Employment Security (Division). The employer-Board filed a letter of protest with the Division, asserting that the claimant was not eligible for unemployment benefits because she had "voluntarily quit," and had not reapplied for the 1979–1980

---

1. All references are to RSMo 1978 unless otherwise indicated.

2. Effective July, 1974 the State Board of Education approved a policy whereby they could issue 45 and 90 day temporary certificates to individuals with at least 60 or 120 semester hours of college credit respectively, but who do not have their permanent teacher's certificate, in order to provide a sure supply of substitute teachers for the school districts. *See* § 161.-092(1), RSMo 1978.

academic year. A deputy for the Division found that claimant "was discharged because she had taught the maximum amount of time allowed on her 90 day teaching certificate," and declared that she was eligible for unemployment benefits. The Board protested the deputy's decision to the Appeals Tribunal of the Division, where the referee of the tribunal affirmed the deputy's finding that claimant had been "discharged," but "not for misconduct connected with her work." [3] The Board appealed the referee's decision to the Commission, which denied the appeal without opinion. The Board petitioned the circuit court for review of the Commission's decision granting benefits.

In reversing, the circuit court concluded that it was technically the "fault" of claimant that she was unemployed, as the word *fault* not only means misconduct, but also includes the "failure of volition" by an employee in retaining a job. The court reasoned that because it was solely within the power of claimant to obtain the required education necessary to acquire a permanent teaching certificate, it was her own failure of volition which resulted in her unemployment. The court also concluded that employees who know that they can work for only a specified time due to matters beyond the control of their employer are deemed to have "voluntarily quit" their employment, (288.050). For these reasons, the trial court decided that claimant was disqualified for unemployment benefits under §§ 288.020 and 288.050.[4]

This is a case of first impression. It is the duty of this court to discern the legislative intent behind the words of these statutes and apply the plain and natural meaning of the words so as to promote the objectives of the Employment Security Act. Section 288.020.2 provides that "this Act shall be liberally construed to accomplish its purpose to promote employment security both by increasing opportunities for jobs and by providing unemployment compensation." Further, all provisions which limit or except certain claimants from benefits must be strictly construed. *Kroger Co. v. Industrial Commission of Missouri*, 314 S.W.2d 250, 254 (Mo.App.1958).

This court notes at the onset that everyday definitions of such pivotal terms as "voluntary," "discharge" and "fault" are not easily plugged into a factual situation such as this one to reach consistent results. For example, one could say that the claimant here did not leave her job because she "wanted to," but only because she was forced to leave by operation of law. In this sense, her leaving was "involuntary" and she should qualify for benefits. On the other hand, another could say that it was the claimant's "fault" that she lost her job because she did not have a permanent certificate, and she should therefore be denied benefits.

## I.

■ Appellants' first point of error is that the circuit court exceeded its scope of review by substituting its own judgment on the factual questions at issue rather than merely determining if the Commission's findings were supported by substantial and competent evidence. Section 288.210 mandates that the jurisdiction of the circuit court be confined to questions of law. Appellants contend the issues before the trial court were questions of fact and not questions of law. This contention is not convincing. The facts in this case are uncontroverted. The circuit court applied these undisputed facts to the applicable statute and case law but interpreted the meaning of the terminology concerning "fault," "voluntary leave" and "discharge" differently than did the Commission. For the circuit

3. There was no appearance on behalf of the claimant. The Board presented one witness and an exhibit explaining the temporary certificate policy.

4. The court also said that the Board did not "discharge" Ms. Kimbrow, as the word *dis-*

*charge* means action attributable to the employer, and here it was not the employer but the mandate of sections 168.011 and 168.081 which made further employment of claimant by the Board illegal.

court to independently interpret the terms of § 288.020 and § 288.050 as a matter of law, and apply those terms to the facts of this case is fully within the court's scope of review. *Hansen v. Division of Employment Security*, 520 S.W.2d 150, 152[3] (Mo.App. 1975). *See also Division of Employment Security v. Labor & Industrial Relations Commission*, 617 S.W.2d 620, 625 (Mo.App. 1981); *First Bank of Commerce v. Labor & Industrial Relations Commission of Missouri*, 612 S.W.2d 39, 42 (Mo.App.1981). The circuit court did not interpret the *evidence* in any different fashion than did the Commission, it only interpreted the *statutes* differently. *Compare Cullors v. Missouri Division of Employment Security*, 564 S.W.2d 596, 598 (Mo.App.1978) (where the facts and circumstances surrounding claimant's quitting were in dispute).

## II.

■ Appellants' second point is that the circuit court misinterpreted § 288.020 in holding that claimant was at "fault" for failing to keep her job, when the circumstances that led to her unemployed status were beyond her control. Deciding on this point necessitates a "yes" or "no" answer to the main question expressed earlier: do the provisions of Chapter 288 allow a non-permanently certified teacher who substitutes for a school board on a temporary basis of fixed duration to collect benefits when the certificate expires?

Appellants first contend that the circuit court erred when it applied the *general* provisions of § 288.020.1 regarding "fault" as controlling over the *specific* provisions of § 288.050.1(1) regarding a "voluntary leave" from employment. Appellants cite to *Duffy v. Labor and Industrial Relations Commission*, 556 S.W.2d 195, 198 (Mo.App. 1977), for its holding that a statute's "general statement of purpose will not be held to contravene the clear language of a disqualification provision." Appellants' reliance on *Duffy* is misplaced.

In *Duffy*, an illness unrelated to the job caused the claimant to leave her job. The trial court affirmed the Commission's denial

of benefits, and the claimant appealed, contending that the general purpose section of the Employment Security Act [*i.e.* "without fault"] should control in favor of benefits over the specific disqualification section on "voluntary leave," which the lower court has said should deny benefits as a matter of law. In the present case, the circuit court concluded that claimant was *both* at "fault" for her lack of employ *and* that she left her job "voluntarily." Thus, the rule of statutory construction stated in *Duffy*, that "[a] general statement of purpose will not be held to contravene the clear language of a specific disqualification provision," will not aid the claimant here, as the circuit court's conclusions with regard to *both* the general and specific statutory provisions are consistent, and *both* serve to disqualify claimant from benefits.

## III.

Appellants further contend that the circuit court erred in its ruling on the specific provision, *i.e.* its finding that Ms. Kimbrow "left [her] work voluntarily without good cause attributable to [her] work or [her] employer." Appellants assert that there is a "general rule that a claimant who accepts a job of unknown, limited duration due to reasons beyond the control of the employer is not deemed to have voluntarily left that job at the end of its term." Appellants claim that the only exception to this "general rule" is when the claimant's own contract or collective bargaining agreement mandates the termination of employment, and that no such bargained-for limitation exists here.

After reviewing the case law on this issue, this court does not find the "general rule" to which appellants refer. While the cases cited by the circuit court and the parties present analogous fact situations, none is directly on point. These and other cases are summarized below under the various factual topics which they cover. The reasoning process and rationale of these cases shed some light on the issue in the case at bar.

(1). *Union Contracts*

A. *Seniority Provisions*

The circuit court cited to three cases as support for its conclusion that Ms. Kimbrow left her job "voluntarily." Two of those cases involve the effect that seniority provisions in a collective bargaining agreement have on the grant or denial of unemployment benefits. In *Dubinsky Brothers, Inc. v. Industrial Commission of Missouri*, 373 S.W.2d 9 (Mo.banc 1963) and *Kilgore v. Industrial Commission of Missouri*, 337 S.W.2d 91 (Mo.App.1960), substitute movie projectionists were held to have "voluntarily" left their jobs when their own union contracts provided that they be replaced by the regular projectionists when the latter returned to a full-time schedule. In *Kilgore*, the court quoted extensively from the Minnesota case of *Anson v. Fisher Amusement Corp.*, 254 Minn. 93, 93 N.W.2d 815 (1958).

In *Anson*, the court held that an employee who left his job pursuant to a collective bargaining agreement seniority provision left "voluntarily and without good cause attributable to his employer . . . ." (M.S.A. § 268.09). The court reasoned thusly:

> Whether the separation from the employment is the voluntary or involuntary act of the employee is determined not by the immediate cause or motive for the act but by whether the employee directly or indirectly exercised a free-will choice and control as to the performance or nonperformance of the act. *If the act of employment separation was performed by him directly of his own free will*, or indirectly by his act of vesting in another discretionary authority to act in his behalf, *the ultimate resulting act is a voluntary one which disqualified him for compensation.* This is likewise true when an employee acts directly in obedience to a representative control which, by his own choice, he had vested in another as his agent. *Id.* 93 N.W.2d at 819 (emphasis added).

In that case, the court stated that the claimant's unemployment resulted from circumstances about which the employer could

do nothing and which were solely within the control of the employee, albeit constructively through his union.

The Minnesota court in *Anson* also discussed the concept of "fault," as the general purpose statute in that state also declared a policy to benefit "persons unemployed through no fault of their own." (M.S.A. § 268.03). The court stated:

> In the case at bar, "fault" in the sense of cause of unemployment cannot be attributed directly to an act of either the employer or the employee. In the literal sense of the term, the employee did not quit his job voluntarily since he was ordered to do so by the union's business representative. Nor can it be said that his unemployment was the fault of the employer, especially in the light of the employer's undisputed testimony that he did not want claimant to leave his employ. So, at least in this case, it would appear that granting compensation would not serve the express policy of encouraging more stable employment since the employer is not guilty of a violation of that principle. Rather, the fault, again in the sense of "cause," in this case lies with the overt act of the union, a third party. *Id.* 93 N.W.2d at 819.

The court in *Kilgore* adopted the reasoning of *Anson* in denying the substitute projectionists unemployment benefits, and the Missouri Supreme Court cited both of those cases approvingly in *Dubinsky*. Because Missouri courts have relied upon the *Anson* case to a considerable extent in cases concerning union contracts, the case history in Minnesota subsequent to *Anson* is especially apposite to this discussion. In *Stawikowski v. Collins Electrical Construction Co.*, 289 N.W.2d 390 (Minn.1979), the claimant lost his job pursuant to a collective bargaining agreement's seniority provision. The claimant urged the court to reconsider the *Anson* rule of "constructive voluntary termination" and reverse that rule in favor of the test for voluntariness found in *Campbell Soup Co. v. Board of Review*, 13 N.J. 431, 100 A.2d 287 (1953), which would limit disqualifications to bar a claimant "only if

he left his work without good cause." 13 N.J. 435, 100 A.2d at 289. The court declined the invitation and reaffirmed *Anson*, concluding that a different result would fly in the face of long-standing judicial authority. However, the court went on to express the belief that the equities of the case favored benefits, but said. that the changes advocated by the claimants "must be instituted by the legislature." 289 N.W.2d at 394. The court added that even though such a legislative change would better serve the objectives of that state's unemployment compensation statute, it would only do so "provided a method to relieve employers of unwarranted financial consequences without imperiling the unemployment reserves were available." *Id.* at 394.

The final case in this Minnesota trilogy is *Loftis v. Legionville School Safety Patrol Training Center, Inc.*, 297 N.W.2d 237 (Minn.1980). *Loftis* involved a fact situation very similar to that in the present case. There, the claimant was hired as a cook for the Legionville School, knowing that the employment was to last for only 11 weeks. In contrast to its past decisions, the Minnesota Supreme Court held that the claimant's knowledge of the temporary nature of her job did not render termination of her employment "voluntary" so as to deny her benefits. The court acknowledged that in 1980 the Minnesota General Assembly had added a subdivision to its section on "voluntary leave" to exclude from that terminology "a separation from employment by reason of its temporary nature or for inability to pass a test or for inability to meet performance standards necessary for continuation of employment ...." *Id.*, fn. 1, at 238. Thus, the holdings in *Anson* and *Stawikowski* were legislatively overruled.

## B. Mandatory Retirement

The circuit court also cited to *McDonnell Douglass Corp. v. Labor and Industrial Relations Commission*, 592 S.W.2d 295 (Mo. App.1979) as support for its conclusion that

claimant left her teaching job "voluntarily". In *McDonnell Douglass*, the claimant retired from his job at the age of 65 pursuant to a pension plan agreed upon by the claimant's union and his employer. The court noted that the New Jersey decision in *Campbell Soup, supra,* was the leading case on the subject, but held that the decisions in *Dubinsky, Kilgore* and *Anson* made it clear that the employees "act of retirement must be deemed voluntary as it was a condition of his employment to which he had agreed through the action of collective bargaining agent." *Id.* at 297. *Compare Kentucky Unemployment Insurance Commission v. Young,* 389 S.W.2d 451 (Ky.1965) (a case similar to *McDonnell Douglass,* but the court ruled that when retirement is the result of unilateral action by the employer, with no negotiation by the employee, the employee did not leave his job voluntarily). *See also Kentucky Unemployment Insurance Commission v. Kroehler Mfg. Co.,* 352 S.W.2d 212 (Ky.App.1961) (court agreed with *McDonnell Douglass* case because the employee's union negotiated the retirement age provision of the contract);[5] *Richardson v. Maine Employment Security Commission,* 229 A.2d 326 (Me.1967) (court found retired employee to have left his job "voluntarily without good cause attributable to such employment", but only after noting the jurisdictions that hold to the contrary and discussing the various economic considerations at issue); *Applegate v. Palladium Publishing Co.,* 95 Mich.App. 299, 290 N.W.2d 128 (1980) (court renounced the "subjective approach" of *Campbell Soup* and decided the case in the manner of *McDonnell Douglass*).

## (2). Leave of Absence

This court's recent decision in *Division of Employment Security v. Labor and Industrial Relations Commission,* 617 S.W.2d 620 (Mo.App.1981), concerned an employee who took a voluntary leave of absence to care for her ailing spouse, the terms of which made her return contingent upon the avail-

---

**5.** The Kentucky statute provides that a claimant is ineligible if "he has left his most recent

suitable work voluntarily without good cause."

ability of work. At the end of her leave of absence, the employee indicated to her employer that she desired to return to work, but received a letter informing her that there were "no positions available." This court reversed the Commission's award of benefits, holding that because a guarantee of re-employment did not exist, the claimant was disqualified under § 288.050.1(1). *Id.* at 628. Because the risk that no job would be available was voluntarily undertaken by the claimant when she took her leave of absence, the separation from her job could also be deemed "voluntary." 617 S.W.2d at 628–29 (Dixon, J. concurring). *Compare Trail v. Industrial Commission,* 540 S.W.2d 179 (Mo.App.1976).

*Neeley v. Industrial Commission,* 379 S.W.2d 201 (Mo.App.1964) and *Bussmann Mfg. Co. v. Industrial Commission,* 335 S.W.2d 456 (Mo.App.1960) both held that a woman who takes a maternity leave is deemed to have left her work voluntarily, because she leaves "of [her] own motion or accord as opposed to a discharge, dismissal or layoff by the employer severing relations with his employees." 379 S.W.2d at 205. *See also Davis v. Labor and Industrial Relations Commission,* 554 S.W.2d 541, 543 (Mo. App.1977).

### (3). *Job Ceases to Exist*

The following cases are relied upon by appellants. In *Cervantes v. Administrator, Unemployment Compensation Act,* 177 Conn. 132, 411 A.2d 921, 923 (1979), the court ruled that a violinist who became unemployed at the expiration of the concert season was entitled to benefits because she had not negotiated her contract with her employer, but was bound to either accept or reject the employer's unilateral offer. Like the Missouri cases, however, the court intimated that the result would have been different had there been active negotiations by the employee or her union representative.[6]

---

**6.** The Connecticut statute provides that a claimant is ineligible if "he has left suitable work voluntarily and without sufficient cause

In *Churchill Downs, Inc. v. Kentucky Unemployment Insurance Commission,* 454 S.W.2d 347 (Ky.App.1970), the court upheld benefits for several race track employees who became unemployed at the end of the race track season. The court said that the employees did not leave the job but rather "the work left them; the work simply ceased to exist." *Id.* at 349. Finally, in *Kentucky Unemployment Insurance Commission v. American National Bank and Trust Co.,* 367 S.W.2d 260, 262 (Ky.App. 1963), a bank guard was not deemed to have "voluntarily left" his temporary employment when building renovations did away with the need for his job, because his job "ceased to exist."

### (4). *Employee Illness*

In *Duffy v. Labor and Industrial Relations Commission, supra,* the claimant telephoned her employer saying she was ill and would not return to work. Relying primarily on *Bussmann, supra,* the court held that she was disqualified for benefits because her "illness was admittedly unrelated to her work or her unemployment ...." 556 S.W.2d at 198.

### (5). *Non-Renewal of Employment Contract*

In *Cardinal Newman College v. Labor and Industrial Relations Commission,* 624 S.W.2d 532, 534 (Mo.App.1981), a college assistant professor's contract provided for possible employment beyond the contract's stated expiration date. When the contract expired, the college chose not to renew. Unlike *Duffy,* the court did not concern itself with the "good cause" aspect of § 288.050, but said that "the sole issue is whether the claimant left work voluntarily." The court, citing to *Kilgore* and *Anson,* held that the claimant did not leave his job "voluntarily," as he "did not 'directly or indirectly [exercise] a free-will choice'" to leave. The professor was "able and willing to continue his job" ... "it was the employ-

---

connected with his work." General Statutes § 31–236(2)(A).

er's act which resulted in the claimant leaving work." *Id.* at 534–35.

### (6). *Operation of Law*

At the time of the case of *Bussmann, supra,* it was unlawful under Missouri law for an employer to permit a female to work within three weeks before or after child birth. (§ 290.060, RSMo 1949, now repealed). As was noted previously, the court held that because the claimant's disability was not causally connected with her work or employer, she was disqualified for benefits. *See also Echols v. Michigan Employment Security Commission,* 380 Mich. 87, 155 N.W.2d 824 (1968) (holding that a taxicab driver who lost his driver's license by operation of law (suspended for traffic violations) left his work voluntarily, the court saying that to allow benefits would go beyond the intention of their act).

\*     \*     \*

Much of the rationale in the above decisions is applicable here. While this case did not involve seniority or mandatory retirement, the definition of "voluntary" contained in *Kilgore, Dubinsky* and *Anson* now encompasses perhaps all but those cases involving a disability (*Bussmann* and *Duffy*), and should apply here. Claimant's teaching job did not "cease to exist," as the Board had jobs available if she had been qualified, nor was the Board's failure to continue claimant's employment a discretionary act of the employer as in *Cardinal Newman. Bussmann, supra,* is perhaps the case most similar on the facts to the present case, as there too the employer was prohibited by statute from permitting the employee to continue to work, and there the court denied benefits under § 288.050.

It is held that claimant left her work "voluntarily" and is therefore disqualified for benefits under § 288.050.1(1). Claimant accepted her employment with her eyes wide-open, fully aware that she would be unemployed when the 45 day certificate and its extension expired. There is no question that she "exercised a free-will choice and control" as to the consequences of her actions, and that her leaving was therefore voluntary. *See Kilgore, supra,* at 98.

If this result seems either harsh or undesirable, it is up to the legislature to change the disqualification statutes and set a new public policy, as was done in Minnesota to change the result in the *Anson* decision. At present, however, this court is constrained by *Kilgore, Dubinsky,* etc., and their interpretation of the legislative intent behind § 288.050.1(1). If a change in our interpretation of these statutes should be made, it would better serve the policies of our Act to leave these proposed changes to the legislative branch, in order to ensure that other changes are made so that the unemployed would have a solvent fund from which to draw their benefits. *See Stawikowski, supra,* at 394 and *Richardson, supra,* at 330.

The general provision that an employee should not be denied benefits if he becomes unemployed "through no fault of his own" is also ruled adversely to the claimant. Under the rationale in *Neeley, supra,* the term fault is not limited to "conduct of the employee which is blameworthy, culpable, wrongful or worthy of censure, but means a failure of volition." The failure here was that the employee-claimant did not obtain the necessary certification to teach past the 90 days. When claimant took the job she knew of this "failure" or deficiency in her professional status, and it should have come to no surprise to her that the Board could employ her no longer.

"Paradoxically, the result in this case denying benefits to the employee is consistent with the legislatively stated purpose of the employment security law, § 288.020 ...." *Division of Employment Security v. Labor & Industrial Relations Commission, supra,* at 628. In his concurrence, Judge Dixon noted that the facts in that case, although denying benefits to an unemployed individual, tended to promote stability of employment by "deferring the necessity for the employee's voluntary termination of employment." In the present case, if every school board in this state that employs substitute teachers who hold only a temporary certificate know that these teachers would be eligible for unemployment benefits, it

seems obvious that these boards simply would not employ those Missouri citizens, since the financial burden of their contribution to the system which supplied those benefits would increase dramatically. This result would not be beneficial to the many Missouri citizens who have temporary teaching certificates and seek gainful employment, nor would it be fair to deny schools in this state the use of the services of teachers who could be available for temporary duty as substitutes.

The judgment of the Circuit Court is affirmed and the cause remanded with directions to remand to the Labor Industrial Commission for a decision denying the claim.